# United States Court of Appeals
# for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

July 24, 2026

Lyle W. Cayce
Clerk

No. 23-20567

MIECO L.L.C.,

*Plaintiff—Appellant/Cross-Appellee*,

*versus*

TARGA GAS MARKETING L.L.C.,

*Defendant—Appellee/Cross-Appellant*.

Appeal from the United States District Court
for the Southern District of Texas
USDC No. 4:21-CV-1128

ON PETITION FOR REHEARING
(REVISED)

Before ELROD, *Chief Judge*, and HIGGINBOTHAM and SOUTHWICK, *Circuit Judges*.

PER CURIAM:

The appeal involves a contract dispute about the delivery of natural gas during Winter Storm Uri in 2021. This court earlier issued an opinion in this appeal. *MIECO L.L.C. v. Targa Gas Mktg. L.L.C.*, 161 F.4th 828 (5th Cir. 2025). Targa Gas has filed a petition for rehearing *en banc*. The petition emphasizes the significance of Part I of our original opinion's Discussion section, which was entitled "*Partial Summary Judgment on* Force Majeure."

That section interpreted a standard-form gas supply contract and its operation during periods of *force majeure*. Targa argues we have unsettled the expectations on which the providers of natural gas operate. That part of the opinion dealt with the circumstances, if any, that would require a natural gas provider to enter the spot market to satisfy its contractual obligations.

The petition as well as briefing by an *amicus* make the obvious point that the issues resolved in Part I of the original opinion's Discussion section are of exceptional importance to the Texas natural gas industry. The issues are governed by state law and are not clearly resolved by the authorities on which the court relied, a common reality for federal courts. The primary task of the court's earlier opinion was to interpret terms in the standard form contract that, according to Targa, "governs the entire natural gas industry in Texas." The petition for rehearing *en banc* urges the court — only if not convinced by the merits arguments, of course — to certify the question to the Supreme Court of Texas. In light of the importance of the issues, and because it may be that the court did affect settled expectations, we have decided to certify the question.

We may certify an unsettled question of state law to a state's highest court when that court has a procedure permitting such questions to be posed. *See* 17A Wright & Miller's Federal Practice & Procedure § 4248 (3d ed. 2015). Texas has such a procedure, found both in the state constitution and its appellate rules. *See* Tex. Const. art. V, § 3–c(a); Tex. R. App. P. 58.1.

No judge in regular active service requested the court be polled on rehearing *en banc*; therefore, the petition for rehearing *en banc* is DENIED. *See* Fed. R. App. P. 40(c). Treating that petition as one for panel rehearing, the petition is GRANTED in part. *See* 5th Cir. R. 40 I.O.P. We withdraw Part I of the Discussion section of our prior panel opinion. The

remainder of the opinion is unaffected by today's ruling, and we again AFFIRM the part of the judgment based on the jury verdict.

The panel issues the following opinion certifying a question to the Supreme Court of Texas.

## CERTIFICATION FROM THE UNITED STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT TO THE SUPREME COURT OF TEXAS.

TO THE SUPREME COURT OF TEXAS AND THE HONORABLE JUSTICES THEREOF:

### STYLE OF THE CASE

The style of this case is *MIECO, L.L.C. v. Targa Gas Mktg. L.L.C.*, No. 23-20567, in the United States Court of Appeals for the Fifth Circuit. The case is on appeal from the United States District Court for the Southern District of Texas. Federal jurisdiction is based on diversity of citizenship.

### FACTUAL AND PROCEDURAL BACKGROUND

This court's original opinion described in detail the background of this case. *See MIECO v. Targa*, 161 F.4th at 833-35. An edited version follows.

MIECO L.L.C. and Targa Gas Marketing L.L.C. buy and sell natural gas. In 2010, they signed a base contract to govern their future gas transactions. The base contract does not compel either party to buy or sell gas, but it does contain the basic terms governing future transactions.

The relevant terms and delivery obligations for this dispute are detailed in two separate "transaction confirmations" that were executed on October 1, 2020. In one, Targa agreed to sell MIECO 15,000 British thermal units (MMBtu) of gas each day from November 1, 2020, through March 31, 2021, at a fixed "First-of-Month" (FOM) price. In the other, Targa was

required to deliver 30,000 MMBtu per day at a variable, daily index price as published by *Gas Daily*. Such daily purchases are in the "spot market." Their agreed-upon delivery location was the NNG Demarc pool in northeastern Kansas. This litigation does not question Targa's performance under these agreements except for six days during Winter Storm Uri.

The storm caused significant disruptions in supply due to power outages and the shutting down of equipment. According to the Department of Energy, production of natural gas dropped 21 percent nationwide during the storm. Targa did not deliver the required 45,000 MMBtu of gas each day from February 15 until February 20, 2021. Instead, it delivered 9,375 MMBtu on February 15; none on February 16, 17, 18, and 20; and 3,164 MMBtu on February 19.

The parties' base contract allowed interruptions in performance without liability when the interruption was caused by *force majeure*. The contract described that term as a "cause not reasonably within the control of the party claiming suspension." These are the relevant *force majeure* contractual provisions:

> **11.1.** [N]either party shall be liable to the other for failure to perform a Firm obligation, to the extent such failure was caused by *Force Majeure*.
>
> **11.2.** *Force Majeure* shall include, but not be limited to . . . (ii) weather related events affecting an entire geographic region, such as low temperatures which cause freezing or failure of wells or lines of pipe; . . . [and (vi) a claim of *Force Majeure*, as described in clauses (i) through (v) above, by an Affiliate supplying or receiving the Gas delivered or to be delivered under this Contract.[1]] Seller and Buyer shall make reasonable efforts to avoid the adverse impacts of a *Force Majeure* and to

---

[1] Clause (vi) was in an addendum to the base contract.

resolve the event or occurrence once it has occurred in order to resume performance.

**11.3.** Neither party shall be entitled to the benefit of the provisions of *Force Majeure* to the extent performance is affected by any or all of the following circumstances: . . . (ii) the party claiming excuse failed to remedy the condition and to resume the performance of such covenants or obligations with reasonable dispatch; or (iii) economic hardship, to include, without limitation, Seller's ability to sell Gas at a higher or more advantageous price than the Contract Price . . . ; or (v) the loss or failure of Seller's gas supply or depletion of reserves, except, in either case, as provided in Section 11.2.

Targa invoked the agreement's *force majeure* provisions on February 17, 2021, crediting (1) a weather-related event affecting an entire geographic region beginning on or around February 12 and (2) the declaration of *force majeure* by Targa's affiliates. MIECO rejected Targa's claim of *force majeure*.

Pursuant to a different agreement between these parties, buyer and seller were reversed, and MIECO delivered gas to Targa. That part of the litigation is not relevant to the certification to the Supreme Court of Texas.

Targa brought its suit against MIECO in Texas state court, seeking a declaration that *force majeure* excused its failure to provide the contracted-for quantities of gas for the few days of the winter storm. MIECO removed the case to the United States District Court for the Southern District of Texas based on diversity jurisdiction. It asserted a counterclaim for breach of contract. Targa moved for partial summary judgment, contending the *force majeure* provisions in Section 11 of the contract excused its performance under the FOM and *Gas Daily* contracts.

The district court granted Targa partial summary judgment, holding "that Uri was a *force majeure* event as it pertains to Targa's obligations under the Contract and that the Contract did not require Targa to purchase

replacement gas." The district court explained that the gas volume at "Targa and its affiliate gas pro[c]essing plants fell in production by 80%," and that Targa sent a notice to MIECO stating: "The gas supply for our sale to you is being or would have been sourced from facilities (including facilities owned or operated by Targa's affiliates) which are experiencing these *force majeure* events." The district court then concluded that the production disruptions by Targa's affiliate suppliers excused Targa's failure to deliver gas at a major trading pool in the Midwest, notwithstanding the fact that Targa, a marketing company that produces none of the gas it sells, could have met its delivery obligations had it purchased gas from non-affiliate sellers.

After the jury rendered a verdict on another part of the litigation, the district court entered judgment for the parties' stipulated amount of $6,933,814.94. MIECO timely appealed the grant of partial summary judgment, and Targa cross-appealed the jury's verdict. To be clear, we again AFFIRM the judgment insofar as it is based on the jury verdict.

## DISCUSSION

The part of this case relevant to the certification to the Supreme Court of Texas was resolved by the district court through a grant of a partial summary judgment. The issue is whether Targa's contract to provide natural gas to MIECO required it to enter the spot market during a *force majeure* event when, before that event, Targa had been satisfying its contractual obligations in part by purchasing on the spot market. The district court answered "no." This court's original panel opinion answered "yes." We give some of the details.

Section 11.3(v) of the *force majeure* section in the Targa contract with MIECO states that the provision is inapplicable to "the loss or failure of Seller's gas supply or depletion of reserves, except, in either case, as provided in Section 11.2." Section 11.2 describes what *force majeure* events are:

"weather related events affecting an entire geographic region, such as low temperatures which cause freezing or failure of wells or lines of pipe."

The central issue, then, is to define "gas supply" in order to determine when there is a loss or failure. In an earlier MIECO case, we defined "gas supply" in this same form contract provision to mean the gas "owned or possessed by" the producer, which was coming from wells in the Permian basin. *MIECO, L.L.C. v. Pioneer Nat. Res. USA, Inc.*, 109 F.4th 710, 721 (5th Cir. 2024) (quotation omitted). Specifically, we held the spot market was not part of the "gas supply." *Id.* at 724.

New York law needed to be applied in that case, but our original panel opinion determined that the law of Texas was the same. *MIECO v. Targa*, 161 F.4th at 843. More importantly, *Pioneer* concerned the obligations of a gas producer whose gas supply was readily defined by the sources from which it was producing. The *Pioneer* court understood that its reasoning might not apply to the situation of a middleman supplier. *Id.* at 721–22. Targa is such an intermediary, and this court needed to take the next analytical step.

The original panel opinion in this case analyzed other relevant authorities, and we do not restate those explanations here. *See MIECO v. Targa*, 161 F.4th at 837–41 (first citing *Virginia Power Energy Mktg., Inc. v. Apache Corp.*, 297 S.W.3d 397 (Tex. App.—Houston [14th Dist.] 2009, pet. denied); then citing *Tejas Power Corp. v. Amerada Hess Corp.*, No. 14-98-00346-CV, 1999 WL 605550 (Tex. App.—Houston [14th Dist.] Aug. 12, 1999, no pet.); and then citing *LNG Ams., Inc. v. Chevron Nat. Gas*, No. H-21-2226, 2023 WL 2920940 (S.D. Tex. Apr. 12, 2023)).

These precedents guided us as we determined the contractually relevant sources of gas supply that needed to have been lost or to have failed. We relied on evidence that before Winter Storm Uri, Targa had fulfilled its obligations under its contract with MIECO by obtaining natural gas from its

affiliates but had also made purchases of, on average, about 29 percent of its contract needs from non-affiliates. *See MIECO v. Targa*, 161 F.4th at 839. There was evidence that Targa purchased gas from 25 to 50 entities daily during the period of its contract with MIECO. *See id.*

From all this, this court determined that the relevant "gas supply" that had to be lost or to have failed was comprised of the sources from which Targa had been purchasing during the earlier period of the contract. *Id.* at 842. That meant that to the extent gas could still be purchased during the winter storm from the same daily or spot market, that part of Targa's existing gas supply remained available even if the price there had dramatically changed. *Id.* Targa's obligations did not extend beyond purchasing from the daily market from which it had previously made purchases. It was Targa's gas supply, not the industry's, from which Targa had to keep purchasing. *Id.*

A related issue under the Targa-MIECO contract is that the party claiming *force majeure* must "make reasonable efforts to avoid the adverse impacts of a *Force Majeure* and [must] resolve the event or occurrence once it has occurred in order to resume performance." *See id.* at 842–44 (discussing Section 11.2 of the base contract). Economic hardship, though, was not sufficient to excuse purchase from its usual gas supply. *Id.* at 842. We had determined that Targa still had to purchase from its usual gas supply sources during the *force majeure* event despite the dramatic price change, but the district court had not made any findings regarding what efforts Targa had made or should have made "to avoid the adverse impacts of a *Force Majeure*" event. *Id.* at 843. "When ['reasonable'] modifies other terms in a contract — reasonable time, reasonable value — it is used by the parties to designate that specific time, value, or dispatch that 'would be thought satisfactory to the offeror by a reasonable man in the position of the offeree.'" *Ergon-W. Va., Inc. v. Dynegy Mktg. & Trade*, 706 F.3d 419, 425 (5th Cir. 2013) (quoting

*Christy v. Andrus*, 722 S.W.2d 822, 824 (Tex. App.—Eastland 1987, writ ref'd n.r.e.)); *see MIECO v. Targa*, 161 F.4th at 843.

Because the district court had determined Targa did not need to enter the spot market, it had not examined the evidence as to what Targa actually had done, whether its efforts were reasonable, and the extent to which there was a loss or failure of its gas supply as we defined it after reasonable efforts. We therefore reversed and remanded on that issue. *See MIECO v. Targa*, 161 F.4th at 843, 849.

## SUMMARY

This court determined that "gas supply" under this standard form contract widely used in the Texas natural gas industry required a non-producer of natural gas, who under its contract to provide natural gas had been purchasing in part from the spot market before a *force majeure* event, had to continue to do so during that event to the extent reasonable even if an economic hardship. In reaching the conclusion, we examined related but not directly on-point caselaw from this court and from Texas courts.

Whether a supplier of natural gas under this standard form contract has to purchase natural gas in the spot market during a *force majeure* event when it has been purchasing in the spot market in satisfying its obligations under the contract before that event is a "determinative question[] of Texas law having no controlling Supreme Court precedent." Tex. R. App. P. 58.1. This court has identified factors it should consider before certifying a question to a state court, the most important of which are the "closeness of the question" and "the existence of sufficient sources of state law." *Williamson v. Elf Aquitaine, Inc.*, 138 F.3d 546, 549 (5th Cir. 1998) (citation omitted). In addition, considerations of comity and practical problems such as delay are also to be evaluated. *Id.* Three out of four support certification: (1) that we do see the issue as close, (2) there are insufficient state law

authorities, and (3) the answer to the question is of importance to a significant Texas industry and to those who rely on it, matters that satisfy the interests of comity. Unfortunately, the delay in resolving this issue is extensive already, and this adds to it. Still, getting the answer right is critical.

We respectfully request an answer from that court on this state-law issue of first impression.

## QUESTION CERTIFIED

We certify the following two questions of state law to the Supreme Court of Texas:

> Under Texas contract interpretation principles, do the *force majeure* provisions of the North American Energy Standards Board form contract require the seller of natural gas who is not a gas producer to enter the spot market during a *force majeure* event if that seller had already been using the daily or spot market for part of its gas supply?

> If there is an obligation on those facts, the second question is:

> How should "reasonable efforts" to provide gas from the spot market be defined?

> Our framing of these certified questions should not be construed as limiting the form or scope of the response by the Court.

QUESTION CERTIFIED TO THE SUPREME COURT OF TEXAS.